**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**MICHAEL SHAUN JONES,**

        **Plaintiff,**

v.                            **Case No.: 2:15-cv-13239**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

        **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 11, 14).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings,

(ECF No. 11), **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 14); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## I.   <u>Procedural History</u>

On May 14, 2012 and November 19, 2012, Plaintiff Michael Shaun Jones ("Claimant") completed applications for DIB and SSI, respectively, alleging a disability onset date of October 17, 2011, (Tr. at 262, 265), due to "Psoriatic arthritis, degenerative arthritis, cyst on spine, [and] Left knee injury." (Tr. at 306). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 198-202, 206-212). Claimant filed a request for an administrative hearing, which was held on March 3, 2014 before the Honorable Jack Penca, Administrative Law Judge ("ALJ"). (Tr. at 115-162). By written decision dated April 15, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 98-109). The ALJ's decision became the final decision of the Commissioner on July 23, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant then filed a Motion for Judgment on the Pleadings and a companion brief in support of the motion, (ECF Nos. 10, 11). In response, the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 14), to which Claimant filed a reply memorandum, (ECF No. 15). Consequently, the matter is fully briefed and ready for resolution.

## II.  **Claimant's Background**

Claimant was 33 years old at the time he filed the instant applications for benefits, and 35 years old on the date of the ALJ's decision. (Tr. at 98, 121, 262). He has an eleventh grade education and communicates in English. (Tr. at 122, 305, 307). Claimant has previously worked in construction and as a manual laborer. (Tr. at 123-24, 307).

## III.  **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* §§ 404.1520a(c),

416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2016. (Tr. at 100, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since October 17, 2011, the

alleged disability onset date. (Tr. at 100, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairment: "psoriatic arthritis." (Tr. at 100-101, Finding No. 3). The ALJ considered Claimant's other alleged impairments of hypertension, hyperlipidemia, elevated liver enzymes, fibrotic fatty tissue, lupus, depression, and degenerative disc disease, but found them to be non-severe, as the conditions either did not exist for a continuous period of twelve months, were responsive to medication, did not require significant medical treatment, or did not result in any sustained exertional or non-exertional functional limitations. (Tr. at 101-103, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 103, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined by 20 CFR 404.1567(c) and 416.967(c) except he could occasionally kneel and crawl and must avoid concentrated exposure to extreme cold.

(Tr. at 103-107, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 107, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine Claimant's ability to engage in substantial gainful activity. (Tr. at 107-108, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1978, and was defined as a younger individual age 18-49; (2) he had a limited education, but could communicate in English; and (3) transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that the Claimant was "not disabled," regardless of whether Claimant

had transferable job skills. (Tr. at 107, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy. For example, Claimant was capable of working as a bus person/dining room attendant, a general cleaner, or a hand packager at the unskilled medium exertional level. (Tr. at 107-108, Finding No. 10). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits. (Tr. at 108, Finding No. 11).

## IV.   Claimant's Challenges to the Commissioner's Decision

Claimant raises two challenges to the Commissioner's decision. (ECF No. 11 at 10-16). In his first challenge, Claimant argues that the ALJ failed to properly assess the credibility of testimony provided by Claimant and his father, erroneously relying on the absence of corroborating medical evidence as a reason to disregard the testimony. Second, Claimant contends that the ALJ's step-three explanation is so devoid of analysis that a reviewer is unable to ascertain the reason for the ALJ's conclusion. Claimant asserts that this type of perfunctory discussion requires remand, because it precludes the court from determining if the Commissioner's decision is supported by substantial evidence.

In response, the Commissioner points out that the ALJ followed the appropriate two-step process in evaluating the statements of Claimant and his father. The Commissioner notes that the absence of medical evidence is relevant to the assessment, and argues that the ALJ provided more reasons for discounting the statements simply than the lack of objective substantiation. (ECF No. 14 at 8-12). With respect to the step-three discussion, the Commissioner contends that the ALJ fully discussed the evidence of record, and the evidence plainly shows that Claimant's impairments do not meet or equal the severity criteria of any listed impairment. The Commissioner states that the record

did not contain conflicting medical evidence on this matter, which would have required a more in-depth discussion of the listing criteria. Instead, the evidence was internally and externally consistent and established that Claimant's impairments were not of the severity described in the Listing.

## V.   Relevant Medical Evidence

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows:

### A. Treatment Records

Claimant treated with Oscar P. Gosien, M.D., for a number of years and produced Dr. Gosien's office records beginning in March 2003. (Tr. at 510). For the most part, Dr. Gosien's records are illegible, and what can be read is largely irrelevant to the issues in dispute, with the exception that the records clearly document Claimant's repeated complaints of low back pain. (Tr. at 448-589). In addition, the physical examinations reflected in the notes do not contain any positive findings related to Claimant's extremities; such as edema, clubbing, cyanosis, or acutely inflamed joints. (*Id.*) In October 2011, and January and February 2012, Claimant complained of knee pain, and in March 2012, he complained of joint pain. (Tr. at 480, 482, 483). However, notes reflecting the assessment and treatment provided by Dr. Gosien, if any, are illegible. (*Id.*).

On November 14, 2011, Claimant presented to Raleigh General Hospital for an MRI of the left knee in preparation for a consultation with Matthew Nelson, M.D. (Tr. at 373-74). The radiologist found no evidence of marrow replacing process or macro fracture. Claimant's quadriceps tendon, patellar tendon, ACL, and PCL were all intact. There was no evidence of medial or lateral meniscal tear. The components of the lateral

collateral ligament and popliteus tendon were intact, as was the medial collateral ligament. There was no evidence of an abnormal loose body or a high-grade chondromalacia. The radiologist concluded that Claimant had no fractures or dislocations, nor evidence of internal derangement; however, he did have trace edema behind the patellar attachment of the patellar tendon. (Tr. at 373-74).

On November 17, 2011, Claimant was examined by Dr. Nelson for evaluation of a work injury that Claimant sustained to his left knee. (Tr. at 372). Claimant told Dr. Nelson that his knee pain had lessened, and he was able to bear weight on his leg without much pain. Swelling of the left knee had also resolved. Claimant described feeling "ok," but stated that he "had not been doing much." (*Id.*). On examination, Claimant was in no acute distress. An inspection of his left knee showed no gross deformity, effusion, erythema, increased warmth, palpable masses, or lymphadenopathy. Claimant's knee was not tender when palpated and demonstrated a full range of motion. There was no laxity with varus or valgus testing. Sensation in the knee was intact throughout, and the capillary refill was less than two seconds. Dr. Nelson noted that the MRI of Claimant's knee was unremarkable. He assessed Claimant with a knee sprain, documenting that Claimant was progressing well and could return to work at full capacity. Dr. Nelson encouraged Claimant to remain active and follow-up as needed.

That same day, Claimant saw Dr. Gosien for recurrent low back pain. (Tr. at 485). Claimant returned to Dr. Gosien on December 14, 2011 with complaints of left knee pain and low back pain. (Tr. at 484).

On February 9, 2012, Claimant presented to Summersville Regional Medical Center's Emergency Department, complaining of chronic bilateral knee pain that became worse with movement. (Tr. at 379-81). Claimant rated the pain as severe and denied

having any recent injury. The Emergency Department physician did not perform an examination of Claimant's knees, but noted that his hips and thighs were normal. Claimant's gait was also not tested due to pain. (Tr. at 381). Claimant was assessed with acute or chronic knee pain. (*Id.*).

Claimant returned to Dr. Gosien on February 16, 2012 with complaints of pain in both knees, as well as low back pain. (Tr. at 470, 482-83). He rated the pain as moderate. Dr. Gosien noted Claimant was scheduled for knee surgery with Dr. Nelson in March. (Tr. at 483). Claimant returned to Dr. Gosien on March 13 with continued complaints of moderate low back pain; however, his physical examination was unremarkable. (Tr. at 471).

On March 14, 2012, Claimant presented to Beckley ARH Hospital to undergo laboratory testing for rheumatoid factor. (Tr. at 394). The test result was negative. X-rays of Claimant's knees were also taken and revealed normal appearing knee joints with good preservation of weight-bearing cartilage height, as well as normal appearing bones and soft tissues. The films were interpreted as normal. (Tr. at 395).

That same day, Prakash Puranik, M.D., examined Claimant for complaints of left knee pain. (Tr. at 401). Claimant rated the pain as eight to nine on a ten-point pain scale. He described the pain as constant and non-radiating, but exacerbated with any movement. Claimant also complained of ankle pain. An examination of Claimant's knee showed no swelling or effusion. A McMurray's test was positive; however, the anterior drawer sign was negative.[1] Claimant could not fully extend his knee, with extension

---

[1] A McMurray's test involves "the rotation of the tibia on the femur to determine injury to meniscal structures," while a drawer sign is an "abnormal forward or backward sliding of the tibia with respect to the femur indicating laxity or tear of the anterior (forward slide) or posterior (backward slide) cruciate ligament of the knee." *See* Medical Dictionary for the Health Professions and Nursing © Farlex 2012.

measuring -4 to -5 degrees. Flexion of the knee measured to ninety degrees, although it was associated with significant pain. Dr. Puranik noted extreme tenderness over the anteromedial joint line. Dr. Puranik reviewed an MRI of Claimant's left knee, identifying some early arthritis, but he saw no evidence of a meniscal or anterior cruciate problem. Dr. Puranik observed an area of contusion in the patellar tendon. Despite the negative MRI findings, Dr. Puranik felt that, clinically, Claimant had a medial meniscal tear. Accordingly, Dr. Puranik injected Claimant's left knee with 40 mg. of Depo-Medrol and 1 cc. of Lidocaine. Claimant was instructed to return in two weeks. (*Id.*).

On March 21, 2012, Claimant returned to Dr. Puranik complaining of pain in both knees. (Tr. at 399-400).  Claimant reported the left knee injection he received one week earlier had provided pain relief for only a day or two. According to Claimant, he began to feel some relief after 24 hours, and the relief lasted a few hours. Dr. Puranik found this description surprising, because the injection was accompanied by a local anesthetic, which should have provided immediate pain relief. Claimant stated that his current pain was fairly significant and was exacerbated by activity or weight bearing; however, there was no radiation to other parts of his body. Claimant had new complaints of shoulder and wrist pain. He also reported chronic low back pain. Dr. Puranik took note that Claimant's rheumatoid factor had been tested and was negative. (Tr. at 399).

On examination, Claimant was observed to be sitting comfortably. His knees showed no obvious swelling or deformity and no effusion. Claimant had pain on movement, but the movement of his knees was full. He complained of general tenderness around the knees. Dr. Puranik recommended that Claimant have a full rheumatoid arthritis panel, begin taking oral anti-arthritic medications, and start physical therapy. (Tr. at 400).

Later that day, Claimant went to Beckley ARH Hospital for an x-ray of the lumbar spine ordered by Dr. Puranik. (Tr. at 382). The x-ray revealed normal soft tissue and bones with well-preserved vertebral bones without lytic or blastic lesion. The disc spaces were unremarkable. There was no spondylolysis or spondylolisthesis; accordingly, the x-ray was interpreted as normal. (*Id.*).

Five days later, on March 26, 2012, Claimant presented to Plateau Medical Center with complaints of knee pain, diffuse arthralgias and myalgias, and migratory nodules that "pop up and go away." (Tr. at 413-16). Claimant indicated that the symptoms started six months earlier and were increasing. The symptoms were located all over his knee, were moderate in intensity, and were relieved by nothing. Claimant was currently prescribed Roxicodone and Lodine. (Tr. at 413-414). Claimant had no other symptoms on a review of systems. For some reason, the examining physician performed a general physical examination, but did not appear to perform any examination of Claimant's knees or musculoskeletal system. (Tr. at 414). The physician gave Claimant intravenous Demerol and Phenergan, diagnosed him with chronic pain, and instructed him to follow-up with Dr. Gosien. Claimant's condition was deemed "non-emergent." (*Id.*).

An initial assessment form was prepared for Dr. Gosien later that day. (Tr. at 416). Claimant described generalized body pain with an onset four months earlier, knots "popping up and going away," and swelling in his hands. Claimant reported having undergone a recent rheumatoid arthritis test. (*Id.*). Dr. Gosien saw Claimant the following day; however, his examination of Claimant was unremarkable. (Tr. at 472, 480).

Claimant returned to Dr. Puranik on April 4, 2012 for follow-up related to his left knee pain. (Tr. at 396-98). Dr. Puranik documented that Claimant suffered a twisting injury to his left knee on October 17, 2011 that was associated with pain, swelling, and

popping. (Tr. at 396). Claimant was unable to bear weight on the knee. He was treated conservatively and was eventually released to return to work; nevertheless, Claimant reported that the pain was too severe to allow him to work. Claimant described his current pain as ten out of ten and constant, becoming worse with activity. He described significant instability and locking of the left knee with recurrent swelling; particularly, after walking.

Dr. Puranik examined Claimant, noting that he was sitting comfortably. (Tr. at 397). He had some tenderness in the lower lumbar area, but his straight leg-raising test was negative. Claimant's hips and ankles were normal. An examination of Claimant's knees elicited complaints of significant pain, but he had no obvious swelling or effusion, and his movements were full, with flexion measuring one hundred twenty degrees. Both anterior drawer sign and Lachman tests[2] were negative; however, a McMurray's test produced pain. There was tenderness in both the medial and lateral joint lines, as well as in the retropatellar area. Dr. Puranik commented that Claimant had no films of his knees. X-rays of the knees were ordered. An MRI of the lumbar spine showed some cysts on the facet joints possibly secondary to facet joint arthritis, although spine x-rays were normal. Claimant's rheumatology workup had shown significant abnormality, so Dr. Puranik decided to refer Claimant to Dr. Saikali for a rheumatology consultation. (Tr. at 398). Dr. Puranik instructed Claimant to return after the knee films were taken and he had seen Dr. Saikali. (Tr. at 397-98).

Claimant returned to Dr. Gosien for complaints of moderate low back pain on April 10, 2012. (Tr. at 473). The visit was unremarkable. A week later, on April 18, 2012,

---

[2] A Lackman test is a "maneuver to detect deficiency of the anterior cruciate ligament; with the knee flexed 20-30 degrees, the tibia is displaced anteriorly relative to the femur; a soft endpoint of greater than 4 mm displacement is positive (i.e., abnormal)." *See* Medical Dictionary for the Health Professions and Nursing © Farlex 2012

Claimant presented to Wassim Saikali, M.D. for a rheumatology consultation. (Tr. at 425—26). Claimant completed a health history form outlining his medical complaints of severe bone pain in all of his joints and knots that occasionally appeared all over his body. Claimant stated that he could "hardly walk." (Tr. at 441-44). Claimant complained of recurrent weight loss, fatigue, eye pain, dry mouth, heart murmurs, swollen legs, morning stiffness, joint pain, swelling, muscle pain and weakness, easy bruising, rash, nodules, headaches, agitation, sleep issues, and being easy to anger. (Tr. at 442). Dr. Saikali noted the Claimant's ANA (antinuclear antibody[3]) test was positive, but his ANA panel was negative. (Tr. at 425). Dr. Saikali felt Claimant most likely had psoriatic arthritis given that Claimant complained of skin psoriasis, multiple joint pain, discomfort in the hands as well as stiffness, soreness, and swelling of the joints. Dr. Saikali also believed the ANA results were most likely unrelated to Claimant's complaints. Laboratory studies were ordered, and Claimant was provided a prescription for Methotrexate. (*Id.*). Dr. Saikali documented that Claimant also took Oxycodone for pain. He felt Claimant should consider starting Enbrel or Humira. (*Id.*).

Claimant returned to Dr. Saikali on May 9, 2012 for follow-up. (T. at 427). Claimant told Dr. Saikali he felt better, could put weight on his knees, and noticed less swelling and stiffness. The psoriasis of the left elbow was nearly gone. On examination, Claimant was in no acute distress. He had mild tenderness over the third proximal interphalangeal joint ("PIP") on the right, and his left knee showed minimal effusion. Claimant was diagnosed with active psoriatic arthritis, improving, and chronic pain syndrome for which he took

---

[3] Antinuclear antibodies ("ANA") are substances produced by the immune system that attack the body's own tissues. "Although ANA are most often identified with [systemic lupus erythematosus] SLE, a positive ANA test can also be a sign of other autoimmune diseases." *Medline*, U.S. National Library of Medicine, National Institutes of Health, U.S. Department of Health and Human Services (page last updated August 23, 2016).

Oxycodone. Claimant's dosage of Methotrexate was increased, and he was advised to do stretching exercises.

Claimant saw Dr. Saikali again on June 7, 2012, reporting that he felt better but continued to have multiple joint pain. (Tr. at 428). He also complained of swelling and discomfort in the hands, wrists, and knees, but reported that the knee swelling improved significantly after taking Prednisone and Methotrexate. Claimant stated that he was stiff in the morning for about 40 minutes, and his mobility was somewhat limited. Claimant did not feel able to work. An examination revealed swelling in Claimant's right third PIP, tender wrists, and tender knees. Claimant was diagnosed with psoriatic arthritis, improving. His dose of Prednisone was decreased due to recent weight gain, and the Methotrexate was continued.

Claimant returned to Plateau Medical Center on August 1, 2012 for an x-ray of the left knee. (Tr. at 411-12). Serafino S. Maducdoc, M.D., found no acute fractures or dislocations and no evidence of erosive arthropathy, but saw small joint effusion. From there, Claimant was examined by Dr. Saikali's certified Physician's Assistant, Ruth Rhodes, PA-C. (Tr. at 429). Claimant reported tolerating his medication, and noted that his joint pain and stiffness had improved. However, he still suffered from stiffness in the mornings, which lasted approximately one hour. In addition, Claimant reported that he had been advised at a recent disability examination that his liver felt enlarged. On examination, Ms. Rhodes found no hot or swollen joints. Claimant's psoriasis had decreased, and he had a full range of motion of all extremities, as well as of the lumbar spine. Ms. Rhodes could not determine whether Claimant's liver was enlarged, but she advised him to stop taking Methotrexate pending the results of his liver enzymes studies. She contacted Claimant's insurance company for authorization to begin Enbrel injections.

On January 4, 2013, Claimant presented to Anita Stewart, D.O., for consultation, advising that he was a patient of Dr. Gosien. (Tr. at 610-12). Claimant reported that he also previously received treatment from Dr. Saikali for psoriatic arthritis and lupus, but due to insurance issues, no longer treated with him. Claimant stated that he had taken opiates for some time to treat his chronic back pain and was scheduled to re-establish care at a pain clinic in the near future. Claimant's current medication regimen included MS Contin, Prednisone, Methotrexate, Exforge, folic acid, Cymbalta, Percocet and Crestor. (Tr. at 610). Dr. Stewart performed a physical examination, beginning with Claimant's general appearance. (Tr. at 611). She described him as "not well developed, buffalo hump, thinning skin, superficial telangiectasias on the maxillary ridge." (*Id.*). With respect to Claimant's musculoskeletal system, Dr. Stewart observed tremor in both hands, rigidity with passive range of motion and cogwheeling.[4] Claimant had a decreased range of motion of the spine, with impairment noted when he got onto the examination table. However, his straight leg-raising test was negative. Claimant's psychiatric examination was normal. His skin examination revealed patches of psoriasis. Dr. Stewart assessed Claimant with psoriatic arthropathy, systemic lupus erythematosus, discogenic syndrome, chronic pain syndrome, and benign essential tremor. (Tr. at 611). She planned to obtain his prior treatment records, order laboratory work, review his medications, and re-examine him in one week. (Tr. at 612). Claimant was to continue his current medications. Dr. Stewart also arranged for Claimant to consult with Thomas Howard, M.D. (rheumatology), and Dr. Ghandy (movement specialist) for possible Parkinson's disease. (Tr. at 612).

---

[4] Cogwheeling is a term used to describe a rigid, jerky, ratchet-like movement of the arms during a neurological examination. Cogwheeling is a primary symptom of Parkinson's disease. *See* http://nihseniorhealth.gov/parkinsonsdisease.

On January 30, 2013, Claimant presented to Dr. Gordinho at Responsible Pain and Anesthetic Management ("RPAM") for treatment of his chronic pain. (Tr. at 662). Claimant reported having pain "everywhere," although worse in his back, knees, and joints. The pain was constant and was both sharp and shooting. He stated that Roxicodone reduced the pain, but did not eliminate it. Claimant provided a history of lupus, psoriatic arthritis, depression, and "Parkinson's." (*Id.*).

Claimant returned to Dr. Stewart on February 1, 2013. (Tr. at 614-15). Claimant had started receiving Enbrel injections and reported some improvement with joint pain. He had shortness of breath on exertion, mild pleuritic pain, and some increased difficulty breathing. Claimant admitted to smoking one pack of cigarettes per day for the past twenty years. (Tr. at 614). On examination, Claimant's respiration rhythm and depth of respirations were abnormal, but his lungs were clear to auscultation. The remainder of the examination was normal. Claimant presented with a euthymic mood. (Tr. at 615). He was assessed with shortness of breath and psoriatic arthropathy.

Claimant returned to Dr. Stewart a few days later, on February 6, 2013, complaining of problems with breathing when resting, coughing, and wheezing. (Tr. at 616-17). Dr. Stewart ordered flu and pneumonia vaccinations, spirometry, and smoking cessation counseling. (Tr. at 616). That same day, Claimant underwent a chest x-ray and spirometry at New River Breathing Center. (Tr. at 634-35). The chest x-ray revealed normal inflated lungs, which were clear, with normal-sized hila, and a midline trachea. Claimant's cardiovascular structures were also normal, and his bony thorax was intact. The spirometry test showed good effort and was found to be within normal range.

Claimant returned to RPAM on February 26, 2013. (Tr. at 661). He complained of back pain, with nausea, vomiting, and diarrhea. Claimant's lumbar spine was tender on

17

examination, but there were no trigger points. Claimant was not able to touch his toes. However, his extremities showed full range of motion. Claimant was assessed with degenerative disc disease and lumbago. (*Id.*).

Claimant followed-up with Dr. Stewart on March 6, 2013, complaining of increased joint pain and swelling. (Tr. at 618-20). He reported trying to stay active and continued to coach a basketball team. Claimant's medications included Oxycodone, folic acid, Crestor, Cymbalta, Methotrexate, Exforge, and Enbrel. (Tr. at 618). Claimant's mood was euthymic and his examination was normal, with the exception of mild swelling of his wrists. Claimant was assessed with psoriatic arthropathy, shortness of breath, and systemic lupus erythematosus. He was advised to continue regular exercises. (Tr. at 619). Dr. Stewart reviewed Claimant's medications, and decided to discontinue Methotrexate in view of Claimant's abnormal liver studies. (Tr. at 620).

On March 14, 2013, Claimant presented to Kuruvilla John, M.D., for an evaluation of hand tremors. (Tr. at 591-92). Claimant reported that the tremors had gradually become worse, making it hard for him to perform such tasks as using a screwdriver. However, Claimant denied a history of difficulty walking other than issues related to arthritis. At this visit, Claimant's mental status was normal. Claimant told Dr. John about his history of psoriatic arthritis, indicating that he had experienced "quite a bit of problems" with it. (Tr. at 591). Claimant was currently taking Methotrexate, but was switching to Enbrel to treat that condition. Dr. John performed a neurological examination, which was normal in all respects. (Tr. at 591-92). He noted that Claimant had no swelling of the extremities and had a normal gait. Dr. John found that Claimant had tremors, but did not have Parkinson's disease. He felt that Claimant's medications might be contributing to the tremors and recommended that no new treatment for the

tremors be instituted until Claimant's arthritis was under better control. (Tr. 592).

Claimant returned to Dr. Howard on March 20, 2013 complaining of psoriatic arthritis and systemic lupus. (Tr. at 601-02). He complained of a two to three-year history of widespread joint pain and stiffness. The morning stiffness lasted about one to two hours, and he indicated that all of his joints were affected. Claimant reported having psoriatic arthritis and also having been told that he had systemic lupus, although the basis of that diagnosis was unclear. (Tr. at 601). Claimant was taking multiple medications at the time, including Prednisone, Methotrexate, Enbrel, Cymbalta, and Roxicodone. On physical examination, Claimant's BMI was 35.18 and his vital signs were normal, except for an accelerated heart rate at 125/min. Claimant appeared in no acute distress. His back was tender with a non-specific pattern of scattered tender points. Claimant's shoulders were mildly tender, but showed good range of motion. His elbows were tender, as were his wrists, which showed mild swelling. Claimant's hands were tender generally at the PIP and metacarpophalangeal joint ("MCP") joints and had some minimal synovitis. His knees were tender, with minimal arthritic findings, and his ankles and feet were swollen and tender bilaterally. However, his peripheral pulses were adequate, and he had normal strength, sensation, and reflexes. An examination of Claimant's skin revealed scattered patches of psoriasis. Dr. Howard assessed Claimant with psoriatic arthropathy, positive ANA, nonspecific elevation of levels of transaminase or lactic acid dehydrogenase, hyperlipidemia, and depressive disorder. (*Id.*). Dr. Howard discussed his findings with Claimant and recommended that he stop taking Enbrel, as it was not helping, and try Humira; not re-start Methotrexate due to his elevated liver enzymes; obtain laboratory work to further investigate the unlikely diagnosis of lupus; and return in two months. (Tr. at 602).

Claimant returned for treatment at RPAM on March 26 and April 10, 2013. (Tr. at 659-60). He continued to complain of back pain and had tenderness in his lumbar spine. Claimant was prescribed Oxycodone for pain relief. (*Id.*).

Claimant returned to Dr. Stewart on May 14, 2013 with some intermittent right upper quadrant pain and occasional heartburn. He continued to take Enbrel for joint pain and swelling and Cymbalta for depression, which Claimant described as a big help. (Tr. at 621-23). Claimant reported seeing Dr. Gordinho for chronic pain and degenerative arthritis of the back. Claimant's physical examination was essentially normal. (Tr. at 622). Dr. Stewart documented that Claimant's liver function studies were still abnormal despite his discontinuation of Methotrexate. She expressed concern that Claimant might have autoimmune hepatitis secondary to his other autoimmune processes. (Tr. at 623).

Dr. Howard saw Claimant in follow-up of his psoriatic arthritis on May 21, 2013. (Tr. at 603-4). Claimant told Dr. Howard he was doing moderately better and believed Humira treated his symptoms slightly better than Enbrel. Claimant continued to have morning stiffness that lasted about an hour, but he had no symptoms consistent with lupus. (Tr. at 603). To treat his pain, Claimant was still taking Roxicodone, and also Valium and Ibuprofen. On examination, Claimant's BMI was 35.30, his vital signs were normal, and he was alert and oriented times three. A joint examination showed mild swelling and synovitis in the ankles, hands, feet, wrists and other joints. Claimant's shoulders were tender, and his knees had mild crepitus with movement. (*Id.*). Claimant's diagnoses remained the same. Dr. Howard told Claimant to continue taking Humira and reassured him that his positive ANA result was almost certainly a false positive given that Claimant had no findings suggestive of an autoimmune connective tissue disorder. (Tr. at 604).

Claimant presented to RPAM on May 22, 2013 for continued treatment of chronic pain. (Tr. at 658). He described his pain as "horrible," stating that it was in his joints, was constant, throbbing, and aching. He had a full range of motion in his extremities, but had tenderness in his thoracic spine. Claimant's pain continued to be severe at his visit on June 19, 2013, with his knees and back hurting most. (Tr. at 657). He described the pain as sharp and burning, and he felt stiff. Claimant had full range of motion of the extremities with tenderness in the thoracic and lumbar spine. However, there were no trigger points. Despite Claimant's complaints, Dr. Gordinho curiously stated that Claimant's pain was decreasing, and his functioning was increasing. (*Id.*).

On July 15, 2013, Claimant presented to Summerville Regional Medical Center for an ultrasound of his abdomen due to pain and elevated liver function studies. (Tr. at 597). Michael Ramsay, M.D., interpreted the ultrasound as showing fatty infiltration of the liver, but without any apparent mass or intrahepatic ductal dilation. The common bile duct and gallbladder appeared to be normal, while the pancreas was not well visualized. Dr. Ramsey did not detect any abnormal fluid collections. (*Id.*).

On July 16, 2013, Claimant returned to RPAM, complaining of pain "everywhere," which was sharp, dull, throbbing, achy, and rated ten on a ten-point scale. (Tr. at 656). He complained of new pain in his hips and ankles. Claimant had a full range of motion of his extremities, tenderness in the lumbar and thoracic spine, but no trigger points. Dr. Gordinho documented that Claimant was meeting his goals of improving function and decreasing pain. (*Id.*).

Dr. Stewart saw Claimant on August 9, 2013 for follow-up. (Tr. at 624-25). At this visit, Claimant was tearful and described being frustrated over his inability to do activities that he used to do. Claimant wanted a prescription for Dexilant for treatment of

heartburn, stating that he had to take Ibuprofen almost daily. Claimant's physical examination was normal, but his mood was dysthymic. (Tr. at 625). Dr. Stewart assessed Claimant with hepatitis, systemic lupus erythematosus, depression with anxiety, and esophageal reflux. Claimant was offered counseling for depression, but he declined. He was continued on Cymbalta along with a discussion of behavioral strategies.  (Tr. at 625). Dr. Stewart also recommended that Claimant eat small meals and reduce his Ibuprofen intake to help with his gastritis symptoms.

Claimant returned to RPAM on August 13, September 10, October 8, November 5, and December 3, 2013 with continued complaints of sharp, achy, global pain that rated ten on the ten-point scale. (Tr. at 651-55). His examination was unchanged on each visit, and by September, Dr. Gordinho stopped noting improvement in pain management and level of functioning. (Tr. at 651-54).

On August 28, 2013, Claimant presented to Dr. Stewart with complaints of swollen lymph nodes in the back of his neck and axilla. (Tr. at 626-27). He also reported increased joint pain and swelling. Claimant was assessed with lymphadenopathy and lethargy. Dr. Stewart felt Claimant's fatigue was most likely due to sleep apnea and planned to refer him for a sleep study. (Tr. at 627).

Dr. Howard examined Claimant again on September 23, 2013 for psoriatic arthritis and swollen lymph nodes. (Tr. at 605-06). Claimant also complained of persistent pain, swelling, and stiffness in his joints. (Tr. at 605). Claimant reported that Humira was no longer helping him, and he wanted to resume taking Enbrel. Claimant had developed lymphadenopathy, which was unexplained, and a fatty liver for which he was scheduled to see a gastroenterologist. On examination, Claimant's BMI was 34.66 and his vital signs were normal. Dr. Howard noted mild synovitis in Claimant's wrists, hands, and other

22

joints, with a slightly diminished range of motion. Claimant had scattered patches of psoriasis, mild lymphadenopathy in the anterior and posterior cervical chain, and mild axillary adenopathy. (*Id.*). Dr. Howard agreed to discontinue Humira and restart Enbrel. He indicated that Claimant might need a surgical consultation for his adenopathy, but felt the consultation request should come from Claimant's primary care physician. Claimant was instructed to return in three months. (Tr. at 606).

Claimant returned to Dr. Stewart on October 4, 2013, expressing concern over enlarged lymph nodes in his neck, which had been waxing and waning. (Tr. at 628-29). He reported that Dr. Howard had recommended biopsy of the nodes. Claimant's physical and psychological examinations were normal. (Tr. at 629). Dr. Stewart ordered laboratory tests and prescribed Augmentin for the lymphadenopathy.

On October 11, 2013, Claimant presented to Ben Hensley, D.O., at Summersville Outpatient Center on a referral by Dr. Stewart due to the lymphadenopathy. (Tr. at 644). The condition was most prominent in Claimant's neck and bilateral armpits. Claimant reported that the nodes became larger at times, and he had periodic night sweats. An examination revealed symmetrical extremities with no edema. Palpation of the neck and bilateral axillae did not show any palpable adenopathy. Claimant had no focal deficits. He was diagnosed with cervical lymphadenopathy. An ultrasound of Claimant's neck was ordered. Claimant returned a few days later on October 16. (Tr. at 643). The ultrasound of the neck revealed a lymph node that measured 1.2 x 4.5 cm on the right but did not appear to have characteristics suspicious for malignancy. Dr. Hensley decided that a biopsy should be performed.

On November 7, 2013, Claimant underwent ultrasound guided excision of the right cervical lymph node at Summersville Regional Medical Center. (Tr. at 646-47). The post-

operative diagnosis was cervical lymphadenopathy. By letter dated November 20, 2013, Dr. Hensley reported to Dr. Stewart that no lymph nodes were identified on excisional biopsy. Instead, he encountered fatty tissue that was abnormal in appearance. (Tr. at 607). Dr. Hensley removed the tissue and subsequently received a pathological diagnosis of fibrotic inflamed fatty tissue. (*Id.*).

On December 4, 2013, Claimant was seen by Lisa Sullivan, Family Nurse Practitioner at CAMC Outpatient Care Center, for elevated liver enzymes. (Tr. at 673-76). Claimant reported that his symptoms started one year earlier, were constant, and were moderate in severity. (Tr. at 673). He connected the onset of his symptoms to the use of Methotrexate for psoriatic arthritis; however, the symptoms continued even after he quit using Methotrexate. Claimant still smoked one pack of cigarettes per day and took multiple medications, including Prednisone, Enbrel, Oxycodone, Ibuprofen, and Cymbalta. (Tr. at 673-74). Nurse Sullivan conducted a review of systems and elicited positive responses for the presence of depression, anxiety, stress, back pain, joint pain, myalgia, immunosuppression with a history of exposure to work-site chemicals, chills, fever, decreased appetite, heartburn, nausea, reflux, dizziness, headaches, numbness, tremors, shortness of breath, pleuritic pain, wheezing, edema in the hands and knees with random knots of the extremities, heat intolerance, hives, rash, psoriasis, pruritus, and lymphadenopathy. (Tr. at 674-75). Claimant also complained of pain in his joints that rated ten on the ten-point scale; however, he denied any change in his functional status. (Tr. at 675).

Nurse Sullivan performed a physical examination, finding Claimant's overall constitution, eyes, nose, pharynx, neck, respiratory and cardiovascular systems to be normal. (*Id.*). Her abdominal examination revealed right upper quadrant tenderness;

hypoactive bowel sounds; central, lower tenderness; and hepatic tenderness. The neurological and musculoskeletal examinations were normal. Nurse Sullivan diagnosed Claimant with elevated liver enzymes, psoriatic arthritis, and fatty liver. She scheduled him to follow-up with Dr. Jeremy Stapleton for his liver and ordered some laboratory studies. (Tr. at 676).

Claimant returned to Dr. Stewart on January 15, 2014, feeling "achy" and coughing. (Tr. at 630-31). Dr. Stewart expressed great concern regarding Claimant's diagnosis of lymphadenopathy and his use of Humira, which placed him at high risk for lymphoma. She ordered laboratory tests and indicated that she would speak with Dr. Hensley about a repeat biopsy. (Tr. at 631).

Claimant returned on January 27, 2014 with continued swelling of lymph nodes. (Tr. at 632-33). He was feeling stressed due to family issues and requested something "short term" for anxiety. On examination, Dr. Stewart palpated nodes bilaterally. Claimant was assessed with lymphadenopathy and depression with anxiety. Dr. Stewart advised Claimant to continue his current medication and gave him fourteen Valium tablets for use, as needed, over the next week. (Tr. at 633).

Claimant returned to RPAM on January 31, 2014 for pain management. (Tr. at 649). On this visit, Claimant's pain level had dropped to eight on the ten-point scale. Otherwise, his examination, diagnoses, and treatment remained the same. (*Id.*).

On February 19, 2014, Claimant returned to CAMC's Outpatient Care Center and was seen by Nurse Practitioner, Lisa Sullivan, under the direction of Dr. Stapleton. (Tr. at 681-88). Claimant complained of persistent moderate and poorly-controlled symptoms related to elevated liver function studies. His medications at that time included Atorvastatin, Cymbalta, Enbrel, Exforge, folic acid, Ibuprofen, Oxycodone and

Prednisone. A review of systems was negative for everything except pain and intolerance to heat. (Tr. at 682). Claimant described the pain as being all over and rated its severity as ten on the ten-point scale. However, he had no change in functional status. (*Id.*). Claimant's physical examination was entirely normal. (Tr. at 683). Laboratory tests were ordered, and Claimant was instructed to follow-up with Dr. Stapleton in six months.

Claimant returned to Dr. Thomas on February 25, 2014. (Tr. at 667, 690-91). Claimant complained of persistent pain, stiffness, and swelling in his joints with extreme pain, stiffness, and swelling in the peripheral joints. Claimant reported taking Enbrel regularly since his last visit; however, the medication only offered slightly better relief than Humira. Claimant told Dr. Thomas he had discussed his arthritis issues with Dr. Stapleton, who told him his liver disease was mild and stable, and if monitored closely, would not prevent Claimant from resuming a standard dose of Methotrexate. (Tr. at 690). Claimant indicated that he wanted to resume Methotrexate. Dr. Thomas performed a physical examination of Claimant and found moderate synovitis in his wrists, hands, elbows, ankles, and feet, and to a lesser degree in the other joints. (Tr. at 691). All of Claimant's joints were tender with diminished range of motion. Claimant was assessed with psoriatic arthropathy, ANA positive, and lymphadenopathy. He was instructed to stop taking Enbrel and begin taking Simponi, Methotrexate, and folic acid. Claimant was given a standing order for laboratory work every eight weeks and was advised to return in three months. (Tr. at 691).

### B. Evaluations and Opinions

On July 31, 2012, Serafino S. Maducdoc, Jr., M.D., completed a Disability Determination Examination at the request of the West Virginia Disability Determination Service. (Tr. at 404-07). Claimant's main complaint was pain in the knees, low back,

hands, and elbows. According to Claimant, in October or November 2011, he began having left knee pain at work and subsequently developed right knee pain as well. He was diagnosed with psoriatic arthritis and reported his pain as ten on the ten-point pain scale. Claimant stated he had trouble walking and that his knees would "give out" on him. Claimant began using a cane for assistance with ambulation in 2012. Dr. Maducdoc reviewed medical records from Dr. Saikali, Dr. Gosien, Dr. Puranik, Dr. Silk, Plateau Medical Center, and Summersville Memorial Hospital. (Tr. at 404-05). He conducted a review of systems with Claimant, which was positive for generalized weakness, occasional headaches, ear pain, shortness of breath, coughing and wheezing, pain in joints, hands, knees, low back and elbow, chronic anxiety and depression, although Claimant denied seeing a psychiatrist.  (Tr. at 405-06). Dr. Maducdoc performed a physical examination of Claimant. Dr. Maducdoc observed that Claimant appeared well-developed and well-nourished. His blood pressure was elevated and his weight was 202 pounds at six feet two inches in height. (Tr. at 406). Claimant had psoriasis on the elbows. Other than mild nearsightedness, Claimant's eyes, ears, head, neck, throat, chest, heart and lungs were normal. Claimant's liver could be palpated at about three to four fingerbreadths below the right costal margin, but his abdominal examination was otherwise unremarkable. Claimant's musculoskeletal examination revealed a normal range of motion of the shoulders, elbows, wrists, and knees. He could fully extend his hands, make a fist and oppose his fingers. His upper extremity strength measured 5/5, and his grip strength was 5/5 with normal fine manipulation. Claimant's hips, ankles, and cervical spine were all normal; however, he appeared to have limited flexion, extension, and lateral flexion of the lumbar spine. Nevertheless, his straight leg-raising test in both the seated and supine positions was normal. Claimant's lower extremity muscle strength measured 5/5, and the

femoral, popliteal, dorsalis pedis, and posterior tibial pulses were normal. Neurologically, Claimant's deep tendon reflexes were 2+ on both sides. His cranial nerves two through twelve were intact with no sensory deficit or muscle atrophy. Claimant's gait was normal, although he could not walk on his toes and heels. Dr. Maducdoc assessed Claimant with psoriatic arthritis, psoriasis, and chronic anxiety and depression, indicating that Claimant had chronic pain in his joints, back, hands, and elbows secondary to psoriasis. (Tr. at 406-07). He opined that Claimant's prognosis was fair. (Tr. at 407).

On August 8, 2012, Pamela Stallo completed a Physical Residual Functional Capacity Evaluation. (Tr. at 181-82). She found Claimant could occasionally lift fifty pounds; frequently lift twenty-five pounds; stand, walk and/or sit about six hours in an eight-hour work day; and had unlimited ability to push or pull. Claimant also had unlimited ability to climb ramps, stairs, ladders, ropes and scaffolds, balance, stoop, and crouch; however, he could only occasionally kneel and crawl. Claimant had no manipulative, visual, or communicative limitations. Ms. Stallo felt Claimant should avoid concentrated exposure to extreme cold, but was able to withstand unlimited exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. Ms. Stallo found that the medical evidence supported only a limitation of the knees due to inflammatory arthritis and noted that Claimant responded to medical treatment for this condition. (Tr. at 182).

Misti Jones-Wheeler, M.S., completed a consultative Mental Health Examination on September 13, 2012 for the West Virginia Department of Disability Determination. (Tr. at 418-22). Claimant presented with a serious, but cooperative attitude. Both his posture and gait appeared within normal limits. (Tr. at 418). Claimant reported that he had always had pain, but he injured his knee in 2011, which made the pain worse. (Tr. at 419). He

reported depression, anxiety, poor sleep, low energy, anger issues, and a history of suicidal ideation with no intent. He denied any prior mental health treatment. Claimant told Ms. Jones-Wheeler that he smoked one pack of cigarettes per day in addition to excessive caffeine intake. He reported health problems that included psoriatic arthritis, degenerative arthritis, spinal cyst, and left knee injury resulting in a torn meniscus. All of these health problems had become worse since 2011. (Tr. at 419). Claimant also reported having a rare blood disease as a child, which caused him to be in the hospital his "entire 2nd grade year." (Tr. at 420). Claimant completed a tenth grade education, quitting school in the eleventh grade when he became angry with his teacher. He reported being a poor student because he did not try, relating that he had to repeat sixth grade because he would not do the school work. Claimant described himself as "insubordinate," indicating that he had been in many fights and broke lots of bones. With respect to his work history, Claimant advised that he last worked in October 2011, stopping when he injured his knee. Prior to that, Claimant worked in construction for 11 to 12 years and had been a consistent worker.

Ms. Jones-Wheeler conducted a mental status examination of Claimant. Claimant was adequately groomed, cooperative, and nice. His speech was within normal limits, and he was oriented in all spheres. Claimant presented a euthymic mood and broad affect. His thought process, content, and perception were all within normal limits. Claimant's insight and judgment were intact, and his psychomotor behavior was within normal limits. Immediate memory and remote memory were normal; however, Claimant's recent memory was severely deficient. Claimant's persistence, concentration, and pace were all within normal limits. (Tr. at 420-21). In regard to social functioning, Ms. Jones-Wheeler found Claimant to maintain appropriate eye contact and exhibit humor. Claimant told

Ms. Jones-Wheeler that, as a function of being married and having children, he primarily socialized with his family. However, he enjoyed hunting, fishing, working and coaching football, although he could not perform any of those activities at the present time. He spent most of his time watching television, sitting on his porch, and helping with his youngest child who was seven months old at the time of the examination. (Tr. at 421). When asked about his typical day, Claimant reported significant changes in his daily activities and living skills. He stated that his wife and children did most of the house and lawn care. Claimant did get out of the house, but he did not go shopping. He was mostly independent in grooming, with the exception that he could not button his clothing and occasionally needed help shaving. Ms. Jones-Wheeler diagnosed Claimant with adjustment disorder with mixed disturbances of emotion and conduct. Claimant connected his emotional symptoms to his physical symptoms, and stated that they interfered with his daily living skills and socialization. His prognosis was guarded. (Tr. at 421-22).

On October 5, 2012, Paula J. Bickham, Ph.D., completed a Psychiatric Review Technique. (Tr. at 179-80). She found that while Claimant had a medically determinable impairment in the form of affective disorder, it did not precisely satisfy the diagnostic criteria. Dr. Bickham assessed Claimant as mildly limited in his activities of daily living and in maintaining concentration, persistence or pace; however, he had no limitations with social functioning and no episodes of decompensation of extended duration. The evidence did not establish the paragraph "C" criteria. (Tr. at 179). Claimant was evaluated under the 12.04 listing and did not meet the severity criteria. Dr. Bickham found Claimant's statements to be only partially credible in that he was being treated with psychotropic medications; however, she felt his claims of mental limitations were

contradicted by Ms. Jones-Wheeler's recent evaluation, which confirmed that all areas of Claimant's mental status were normal. (Tr. at 179-80).  Dr. Bickham disagreed with Ms. Jones-Wheeler's finding that Claimant had a severely deficient recent memory, pointing out that Claimant needed few reminders for his daily activities. That, coupled with the fact that Ms. Jones-Wheeler did not conduct the memory test in a manner consistent with standard protocol, caused Dr. Bickham to give no weight to Ms. Jones-Wheeler's conclusion regarding Claimant's recent memory. In summary, Dr. Bickham found Claimant's mental impairments to be non-severe. (Tr. at 180). On November 2, 2012, Frank Roman, Ed.D., completed a Case Analysis after reviewing the medical records and affirmed the initial assessment of Dr. Bickham. (Tr. at 190-91).

Dominic Gaziano, M.D., completed a Physical Residual Functional Capacity Assessment on November 6, 2012. (Tr. at 192-94). He found Claimant could occasionally lift and/or carry fifty pounds; frequently lift and/or carry twenty-five pounds; stand, walk and/or sit about six hours in an eight-hour workday; and had an unlimited ability to push and pull. (Tr. at 192-93). Although Claimant was unlimited in his ability to climb ramps, stairs, ladders, ropes, scaffolds, balance, stoop, and crouch, Dr. Gaziano felt Claimant could only occasionally kneel and crawl. Claimant had no manipulative, visual or communicative limitations. As to environmental limitations, Dr. Gaziano opined that Claimant could have unlimited exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation and hazards, such as machinery and heights, but should avoid concentrated exposure to extreme cold. (Tr. at 193-94). Under the "additional explanation" portion of the form, Dr. Gaziano summarized that the medical evidence only established some limitations related to Claimant's knees, which were due to inflammatory arthritis. Dr. Gaziano emphasized, however, that Claimant

responded to medical treatment for arthritis. (Tr. at 194).

On January 28, 2014, Anita R. Stewart, D.O., wrote a letter on behalf of Claimant's request for disability benefits.  (Tr. at 648). She reported treating Claimant since January 1, 2013 for diagnoses of psoriatic arthritis and systemic lupus erythematosus. Dr. Stewart indicated that Claimant was under the care of a rheumatologist, and although he had tried various regimens for his illnesses, he continued to have significant and debilitating arthropathy and pain. Dr. Stewart also reported that Claimant found some pain relief with Prednisone; however, the side effects of this medication made it difficult for him to perform his prior occupation in construction, which required heavy labor and lifting. Dr. Stewart added that Claimant had "flare ups" related to his medical conditions, which rendered him completely disabled. In addition, she found Claimant had other medical issues which complicated the matter, including chronic pain from degenerative arthritis of the back, depression, hypertension, hyperlipidemia, elevated liver function studies, tobacco abuse, and a recent lymphadenopathy that was evaluated by multiple specialists. Dr. Stewart opined it was not "realistic for [Claimant] to maintain gainful employment in his customary occupation of construction due to significantly debilitating chronic diseases, in particular, rheumatologic conditions." (*Id.*).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  <u>Discussion</u>

As previously stated, Claimant challenges the ALJ's credibility determination and his step-three analysis comparing Claimant's impairments to the severity criteria of Listing 14.09. The undersigned will address the challenges in reverse order.

### A.  *Listing 14.09 (Inflammatory Arthritis)*

A claimant should be found disabled at step three of the sequential disability determination process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 404.1525. Thus, the Listing identifies individuals whose mental or physical impairments are so severe that they are conclusively presumed disabled regardless of their vocational background. For that reason, the criteria

33

of each listed impairment corresponds to a higher level of severity than necessary to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). To meet or equal a listed impairment, a claimant must show that his or her impairments "meet *all* of the specified medical criteria" set forth in the Listing. *Id.* at 530. The claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

In the instant case, the ALJ compared Claimant's severe impairment of psoriatic arthritis to the criteria of Listing 14.09 (Inflammatory Arthritis). The ALJ concluded that Claimant did not meet or equal Listing 14.09, because:

> Listing 14.09 ... requires evidence of inflammatory arthritis, as described in listing section 14.00B6, with persistent inflammation or deformity in two or more major joints resulting in inability to ambulate effectively or inability to perform fine and gross movements effectively; at least moderate involvement of two or more organs/body systems and at least two constitutional signs or symptoms (e.g. fatigue, fever, malaise, weight loss); ankylosing spondylitis or other spondyloarthropathy with fixation of the spine shown by medically acceptable imaging; or repeated manifestations of inflammatory arthritis with at least two documented constitutional symptoms and signs, and limitations in activities of daily living, social functioning, and completing tasks in a timely manner.

(Tr. at 103). Claimant does not contend that the ALJ considered the wrong listed impairment, or that he should have evaluated Claimant's impairments against additional listed impairments. Instead, Claimant argues that the ALJ's discussion of why Claimant did not meet or equal the Listing was so "conclusory and uninformative" that it is impossible to discern what evidence informed the ALJ's determination. (ECF No. 11 at 15).

In *Radford v. Colvin,* the Fourth Circuit reiterated that "[a] necessary predicate to engaging in substantial review is a record of the basis for the ALJ's ruling." *Id.,* 734 F.3d 288, 295 (4th Cir. 2013) (citing *Gorden v. Schweiker,* 725 F.2d 231, 235 (4th Cir. 1984)).

To satisfy that predicate, "[t]he record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Id.* (*citing* Hines v. Bowen 872 F.2d 56, 59 (4th Cir. 1989). The Fourth Circuit indicated that "[i]f the reviewing court has no way of evaluating the basis for the ALJ's decision, then 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Id.* (*quoting* Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)). In *Radford,* the Fourth Circuit found the ALJ's step-three discussion to be inadequate because it lacked legal analysis and "failed to compare [the claimant's] symptoms to the requirements of any of the … listed impairments, except in a very summary way." *Id.* (quoting *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)). The Fourth Circuit noted that the ALJ's perfunctory assessment was particularly inappropriate in Radford's case, because "[his] medical record include[d] a fair amount of evidence supportive of his claim." *Id.* (citing Murphy v. Bowen, 810 F.2d 433, 437 (4th Cir. 1987)).

In *Fox v. Colvin,* the Fourth Circuit again addressed the requirement that an ALJ's written decision include more than a "bare recital that [the ALJ] considered the evidence." *Id.* 632 F. App'x 750, 754 (4th Cir. 2015). The Fourth Circuit emphasized that vague, circular, or boilerplate statements by the ALJ did not provide a sufficient explanation upon which to review the ALJ's decision. Moreover, the Fourth Circuit admonished district courts not to conduct the fact-finding exercise that should have been done by the ALJ in the first instance, adding "[o]ur circuit precedent makes clear that it is not our role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record." *Id.* at 755. The problem with a perfunctory analysis by the ALJ is even more pronounced when "inconsistent evidence

abounds," because the reviewing court is then left to wonder "in such a way that [it] cannot conduct 'meaningful review.'" *Id.* (quoting *Mascio v. Colvin,* 780 F.3d 632, 638 (4th Cir. 2015).

Nevertheless, an ALJ is not expected to produce a written decision that exemplifies procedural perfection. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988) ("Procedural perfection in administrative proceedings is not required."). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983); *see, also*, *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). "[P]rocedural improprieties alleged by [a claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). Furthermore, "[a] discussion of the relevant evidence elsewhere in the ALJ's opinion may demonstrate that, regardless of an imprecise discussion at step three, the ALJ fully and properly considered all the relevant evidence in his step three analysis." *Robinson v. Colvin*, No. 7:12CV272, 2014 WL 1276507, at *4 (W.D. Va. Mar. 27, 2014); *see, also, Patterson v. Colvin,* 2013 WL 4441986, at *5 (D.S.C. Aug. 15, 2013) ("The Fourth Circuit has held that it is not always necessary for the ALJ to present evidence under a particular step, as long as it is possible, from reading the ALJ's decision in its entirety, to determine whether there was substantial evidence to support the ALJ's conclusions.") (citing *McCarty v. Apfel,* 28 F. App'x 277, 279–80 (4th Cir.2002)). In other words, "a

36

remand is not warranted 'where it is clear from the record which listing ... [was] considered, and there is elsewhere in the ALJ's opinion an equivalent discussion of the medical evidence relevant to the Step Three analysis which allows this Court readily to determine whether there was substantial evidence to support the ALJ's Step Three conclusion.'" *Dunford v. Astrue*, No. BPG-10-0124, 2012 WL 380057, at *3 (D. Md. Feb. 3, 2012) (citing *Schoofield v. Barnhart,* 220 F.Supp.2d 512, 522 (D.Md. 2002)).

Here, the ALJ explicitly identified the listed impairment that he considered and specified the criteria of Listing 14.09 that he believed were not established by the evidence. (Tr. at 103). However, the ALJ erred by failing to explain at that point in the written decision what particular evidence he considered and what information he found persuasive in reaching his conclusion that Claimant did not meet or equal Listing 14.09. Consequently, the Commissioner's decision should be remanded unless elsewhere in the written decision, the ALJ supplied an explanation of the record that communicated a sufficiently clear picture of what evidence he felt substantially supported his determination.

At step two of the process, the ALJ analyzed Claimant's alleged impairments to ascertain if they were severe or non-severe. (Tr. at 100-03). As part of this analysis, the ALJ looked at Claimant's mental impairments using the special technique. He concluded that Claimant had no limitations in social functioning and only mild limitations in activities of daily living, noting that Claimant could perform his personal care with little assistance and participated in caring for his children. (Tr. at 102). The ALJ also found that Claimant had only mild limitations maintaining persistence, pace, and concentration. Although Claimant reported having trouble with instructions and requiring reminders to take his medication, the ALJ pointed out that Claimant could manage household finances,

pay attention and concentrate when watching television, and was observed at his agency evaluations as displaying normal concentration, persistence, and pace. (*Id.*).

When discussing Claimant's RFC, the ALJ examined the reliability of Claimant's statements, as well as the statements of his father. (Tr. at 103-07). The ALJ determined that Claimant's statements regarding the disabling effect of his psoriatic arthritis were not supported by the evidence. The ALJ explained that the treatment notes provided by Claimant indicated that medications were effective in treating his arthritic symptoms, and his examinations were largely normal. The ALJ discussed an MRI taken of Claimant's knees, which contained no remarkable findings. Despite complaints of pain on movement, Claimant had a full range of motion of the knees. Moreover, although Claimant complained of pain, swelling, and locking of his knees, Dr. Puranik's examination revealed no obvious swelling or effusion, and Claimant did not appear to be significantly limited. (Tr. at 104). Claimant's knee and lumbar x-rays were normal, and his rheumatoid factor was negative on more than one laboratory study. The ALJ also noted that in July 2012, when Claimant was examined by consultative examiner, Dr. Maducdoc, Claimant's range of motion in the shoulders, elbows, wrists, and knees were normal, and his strength was 5/5 in the upper extremities. In addition, Claimant was able to extend his fingers, make a fist, and oppose his fingers. His grip strength was normal, his fine manipulation was intact, and his hips and ankles were normal. (Tr. at 105). At a September 2012 evaluation, Ms. Jones-Wheeler observed Claimant's gait and posture to be normal; at a March 2013 examination, Claimant's extremities had no swelling and displayed normal power and tone. (Tr. at 104). Also in March 2013, rheumatologist, Dr. Howard, noted only minimal arthritic findings, with normal strength, sensation, and reflexes. (Tr. at 105).

The ALJ also pointed out statements made by Claimant that seemed inconsistent with the record. (*Id.*). He concluded that Claimant was not entirely credible, given that Claimant's "description of the severity of the pain has been so extreme as to appear implausible." (*Id.*). By way of example, the ALJ mentioned a record prepared by Dr. Puranik in which he expressed surprise by Claimant's allegation that a steroid injection had only helped for one day. The ALJ felt it was significant that none of Claimant's treating physicians placed any restrictions on his activities, presuming that if Claimant truly had disabling arthritis, one of the physicians would have suggested limitations. However, to the contrary, Dr. Saikali, another rheumatologist, encouraged Claimant to exercise on a regular basis. (Tr. at 429).

With respect to medical source opinions, the ALJ gave great weight to agency consultants who opined that Claimant was capable of medium level exertional work. (Tr. at 106). He found the opinions to be balanced, objective, and consistent with the evidence as a whole. The ALJ conceded that the agency consultants did not treat Claimant, but they did conduct a thorough review of the record, supported their opinions with references to evidence, and enjoyed familiarity with Social Security disability standards. The ALJ expressed his disagreement with Dr. Saikali's statement that Claimant was unable to work, because Dr. Saikali's records showed that Claimant improved with treatment. (*Id.*). Furthermore, Dr. Saikali's examination reflected that Claimant had only mild tenderness in his right hand and minimal effusion of the knee with nearly resolved psoriatic arthritis.

Therefore, taking into account the ALJ's discussion at other places in the decision, the undersigned **FINDS** that while the ALJ did not expressly explain at step three what evidence he found persuasive in reaching his determination, the error was harmless because (1) the ALJ identified the relevant evidence by citations to the record at other

places in the decision; (2) the ALJ analyzed the record as a whole, resolving conflicts in the evidence, and explaining how and why he believed certain pieces of information substantiated his conclusions; and (3) the evidence most pertinent to an analysis of the Listing was largely consistent, rather than "abounding" with conflicts. The written decision shows that, before moving on to step four of the sequential process, the ALJ supplied a more than adequate analysis of the evidence, such that a court reviewing the decision could understand the basis of the ALJ's step three determination without having to embark on its own fact-finding mission.

Having concluded that the ALJ's explanation, while not perfectly ordered, was sufficient when taken as a whole, the undersigned must now assess whether the evidence relied upon by the ALJ substantially supports his step three determination. In order to meet or equal Listing 14.09, Claimant must have inflammatory arthritis, as documented in section 14.00B6, along with one of four additional sets of severity criteria, including:

A. Persistent inflammation or persistent deformity of:

1. One or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively (as defined in 14.00C6); or

2. One or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively (as defined in 14.00C7).

or

B. Inflammation or deformity in one or more major peripheral joints with:

1. Involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity; and

2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).

or

40

C. Ankylosing spondylitis or other spondyloarthropathies, with:

1. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 45° or more of flexion from the vertical position (zero degrees); or

2. Ankylosis (fixation) of the dorsolumbar or cervical spine as shown by appropriate medically acceptable imaging and measured on physical examination at 30° or more of flexion (but less than 45°) measured from the vertical position (zero degrees), and involvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity.

or

D. Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:

1. Limitation of activities of daily living.

2. Limitation in maintaining social functioning.

3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 CFR §Pt. 404, Subpt. P, App. 1, § 14.09.[5] With this framework in mind, the ALJ started out by explaining that although Claimant had evidence of psoriatic arthritis, the record did not contain objective findings that satisfied any of the four sets of severity criteria. (Tr. at 103). First, Claimant did not have evidence of persistent inflammation or deformity in two or more major joints resulting in either the inability to ambulate effectively, or the inability to perform fine and gross movements effectively. (Tr. at 103). The term "major peripheral joints" in section 14.00B6 refers to "the hip, knee, shoulder, elbow, wrist-hand, and ankle-foot, as opposed to other peripheral joints (e.g., the joints of the hand or

---

[5] The Listing has been amended since the ALJ's decision; accordingly, the version available to the ALJ is used herein.

forefoot) or axial joints (i.e., the joints of the spine.)." 20 CFR §Pt. 404, Subpt. P, App. 1, § 1.00F. The phrase "inability to ambulate" means "an extreme limitation of the ability to walk … that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities … [and includes] having insufficient lower extremity functioning … to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities," while the "inability to perform fine and gross movements effectively" is "an extreme loss of function of both upper extremities … that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 CFR §Pt. 404, Subpt. P, App. 1, §§ 1.00B2b, 100B2c.

In his later discussion of the evidence, the ALJ pointed out that Claimant consistently had a normal range of motion in all major joints. He could carry out his activities of daily living with only mild limitations. Claimant was noted to have a normal gait. His physical examinations generally resulted in unremarkable findings, and there was no documentation of major peripheral joint deformity, or evidence of persistent inflammation. (Tr. at 104). Claimant's medical imaging was normal; his posture was normal; his hips and ankles were normal; and in March 2013, Claimant's rheumatologist, Dr. Howard, found only minimal arthritic findings with normal strength, sensation, and reflex. (Tr. at 104-05). Although Claimant allegedly carried a cane in his dominant hand to help him stand and balance, he did not use an assistive device that limited the functioning of both upper extremities.  Thus, in light of the evidence discussed by the ALJ, Claimant did not meet or equal the first set of criteria.

Next, the ALJ stated that Claimant did not have at least moderate involvement of two or more organs/body systems and at least two constitutional signs or symptoms. (Tr.

at 103). According to Listing 14.09B, to meet or equal the listed impairment, constitutional signs and symptoms, such as fever, fatigue, malaise, and weight loss must be "significant" and "documented," and the involvement of two or more body systems/organs requires that at least one organ or body system show a moderate level of severity. The ALJ indicated that Claimant had evidence of a fatty liver and a mild tremor; however, these conditions were non-severe. (Tr. at 101). The ALJ emphasized that none of Claimant's other medical problems required aggressive treatment. The ALJ examined Claimant's pulmonary, musculoskeletal, endocrine, and cardiac function, but did not identify any significant constitutional signs or symptoms, organ involvement, or impairment of a body system. The ALJ rejected Claimant's unsubstantiated claim of systemic lupus, emphasizing that although Claimant had a positive ANA test in September 2013, his rheumatologist did not feel that a diagnosis of lupus was indicated, as Claimant did not have the symptoms or clinical documentation to support the diagnosis. (Tr. at 101). Section 14.00B6e explains:

> Listing-level severity is shown in 14.09B, 14.09C2, and 14.09D by inflammatory arthritis that involves various combinations of complications of one or more major peripheral joints or other joints, such as inflammation or deformity, extra-articular features, repeated manifestations, and constitutional symptoms or signs. Extra-articular impairments may also meet listings in other body systems. ... Extra-articular features of inflammatory arthritis may involve any body system; for example: Musculoskeletal (heel enthesopathy), ophthalmologic (iridocyclitis, keratoconjunctivitis sicca, uveitis), pulmonary (pleuritis, pulmonary fibrosis or nodules, restrictive lung disease), cardiovascular (aortic valve insufficiency, arrhythmias, coronary arteritis, myocarditis, pericarditis, Raynaud's phenomenon, systemic vasculitis), renal (amyloidosis of the kidney), hematologic (chronic anemia, thrombocytopenia), neurologic (peripheral neuropathy, radiculopathy, spinal cord or cauda equina compression with sensory and motor loss), mental (cognitive dysfunction, poor memory), and immune system (Felty's syndrome (hypersplenism with compromised immune competence)).

20 CFR §Pt. 404, Subpt. P, App. 1, §14.00B6e. Claimant offers no argument or evidence

in his briefs suggesting that he has the signs and symptoms of a persistent systemic illness, such as lupus, or a significant constitutional impairment, or involvement of two or more body systems or organs. Indeed, Claimant attributes most of his functional limitation to generalized pain, rather than documented constitutional, organ, or body system involvement. Consequently, in light of the evidence discussed by the ALJ, Claimant does not meet or equal the criteria for Listing 14.09B.

Third, the ALJ concluded that Claimant did not have ankylosing spondylitis[6] or other spondyloarthropathy with fixation of the spine shown on medical imaging. (Tr. at 103). The record is clear that Claimant was never diagnosed with ankylosing spondylitis. Moreover, as the ALJ discussed, Claimant's lumbar spine x-rays were normal. (Tr. at 104). Nothing in the clinical record established fixation of Claimant's dorsolumbar spine. Therefore, in light of the evidence discussed by the ALJ, Claimant does not meet or equal Listing 14.09C.

Finally, Listing 14.09D requires, in addition to evidence of inflammatory arthritis and at least two constitutional signs or symptoms, marked limitations in one of the three functional categories used to evaluate the severity of mental impairments. Examining the evidence analyzed by the ALJ, Claimant does not meet or equal Listing 14.09D given that he had no limitations in social functioning and only mild limitations in activities of daily living and maintaining concentration, persistence, and pace. (Tr. at 102).

Of note, Claimant does not specify in his briefs which paragraph of Listing 14.09 he believes he meets or equals on the basis of the record evidence. Nor does Claimant

---

[6] Ankylosing spondylitis (AS) is a form of arthritis that affects the joints in the spine. Spondylitis causes inflammation (redness, heat, swelling, and pain) in the spine or vertebrae. AS often involves an inflamed sacroiliac (SI) joint, where the spine joins the pelvis. *See* National Institute of Arthritis and Musculoskeletal and Skin Diseases (NIAMS) Information Clearinghouse, National Institutes of Health.

provide any references to evidence that contradict the ALJ's step three finding, or corroborate that Claimant had listing-level inflammatory arthritis. Claimant focuses entirely on the ALJ's failure to properly organize his thoughts at the correct location in the written decision. As a result, Claimant overlooks the important questions; that being, (1) does the ALJ's discussion at any point in the decision adequately explain his step three finding, and (2) is his step three finding supported by substantial evidence? Considering that only one listed impairment was applicable in Claimant's case, a reviewing court can easily compare the requirements of that listing to the evidence discussed by the ALJ elsewhere in the decision and can adequately assess the merits of the ALJ's step three finding. Therefore, after carefully reviewing the decision, the undersigned **FINDS** that the ALJ provided a sufficient explanation of his rationale for concluding that Claimant's psoriatic arthritis did not meet the severity criteria of Listing 14.09, and his conclusion was supported by substantial evidence. Because Claimant was not prejudiced by the ALJ's failure to place the explanation in closer proximity to his step three finding, remand on this ground is not appropriate.

### B. ALJ's Assessment of Statements by Claimant and his Father

In his second challenge, Claimant argues that the ALJ erred in evaluating the credibility of statements made by Claimant and his father. Pursuant to 20 C.F.R. §§ 404.1529, 416.929, the ALJ evaluates a claimant's report of symptoms using a two-step method. First, the ALJ must assess whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR")

16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016).[7] Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to

---

[7] The SSA recently provided guidance for evaluating a claimant's report of symptoms in the form of SSR 16-3p. In doing so, the SSA rescinded SSR 96-7p, 1996 WL 374186, which the parties relied on in their memoranda. The undersigned finds it appropriate to consider Claimant's second challenge under the more recent Ruling as it "is a clarification of, rather than a change to, existing law." *Matula v. Colvin*, No. 14 C 7679, 2016 WL 2899267, at *7 n.2 (N.D. Ill. May 17, 2016); *see also Morris v. Colvin*, No. 14-CV-689, 2016 WL 3085427, at *8 n.7 (W.D.N.Y. June 2, 2016).

46

the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the Ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find

the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person"; rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment

48

for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, Claimant criticizes the validity of the ALJ's symptoms evaluation primarily on two grounds. First, Claimant argues that the ALJ considered only the objective medical evidence in assessing Claimant's credibility, instead of examining all of the factors required by the SSA. Second, Claimant contends that the ALJ's reasons for rejecting the testimony of Claimant's father was improper. The ALJ noted that Claimant's father had no medical training and was biased in Claimant's favor; therefore, his testimony was not given significant weight. Claimant points out that family members are expected to be biased to some degree, but the SSA still requires the ALJ to fairly evaluate their statements.

The undersigned finds neither of Claimant's arguments to be persuasive, because they do not accurately convey the ALJ's assessment. As previously discussed, the ALJ found the severity statements offered by Claimant and his father to be less than credible, and the ALJ provided good reasons for his conclusion. With respect to Claimant's statements, the ALJ did review the objective medical findings that he felt contradicted Claimant's self-described limitations; however, the ALJ also highlighted Claimant's inconsistent statements. For example, the ALJ noted that Claimant alleged disabling symptoms, yet reported on multiple occasions that his medication helped significantly in relieving those symptoms. (Tr. at 105). The ALJ also mentioned the skepticism documented by Dr. Puranik when Claimant complained that an injection of pain medication helped for only one day, as well as the discrepancy between the records and

49

Claimant's testimony that the cane he used was prescribed by Dr. Gosien. (*Id.*). In addition, the ALJ discussed testimony by Claimant in which he stated that his condition occasionally made him fall when, to the contrary, he had reported to the pain clinic between January 2013 through January 2014 that he had not experienced any falls. (*Id.*). The ALJ added that Claimant had no functional restrictions placed on him by any physician, and he was still engaging in many daily activities, including coaching basketball, which made his allegations of disabling symptoms implausible. Thus, the ALJ clearly considered many more factors in his credibility assessment than simply the objective medical evidence.

In regard to the testimony of Claimant's father, the ALJ did not give those statements significant weight, because Claimant's father was not medically trained; he was not a disinterested witness; he had a natural tendency to agree with Claimant's statements; and, most importantly, his testimony was not consistent with the medical evidence. The nature of an "other source's" relationship with the claimant is a valid factor for the ALJ to consider is assessing the reliability of the other source's statements. *See, e.g., Gibson v. Colvin*, No. CV 6:14-4772-MGL-KFM, 2016 WL 639253, at *16 (D.S.C. Jan. 28, 2016), *report and recommendation adopted,* No. CV 6:14-04772-MGL, 2016 WL 631983 (D.S.C. Feb. 17, 2016) ("In considering evidence from 'non-medical sources' such as spouses, parents, friends, and neighbors, 'it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.'") (citing SSR 06–03p, 2006 WL 2329939, at *5–6)). A lack of training in the medical aspects of the conditions alleged by the claimant and the consistency of the source's statement with other evidence are likewise appropriate factors in assessing credibility.

*See* SSR 06–03p, at \*6. The ALJ is not required to comment on every factor in the written decision, as long as the ones most pertinent to the evaluation are addressed. *Id.*at \*7.

In this case, the ALJ followed the two-step process, compared and contrasted the statements with the evidence, and provided an adequate explanation for the weight given to the statements of Claimant and his father. Moreover, the ALJ's credibility analysis was supported by substantial evidence. Accordingly, the undersigned **FINDS** that the ALJ fulfilled his obligations related to assessing the credibility of the statements offered by Claimant and his father, and there is no merit to Claimant's second challenge.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the foregoing findings and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 11), **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 14); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District

Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  October 6, 2016

Cheryl A. Eifert
United States Magistrate Judge